UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARIAN T. BORONDY, *individually and as Personal Representative of the Estate of Nicholas Diaz, deceased*, | ) ) ) ) | |
| *Plaintiff*, | ) ) | No. 1:20-cv-02158-JMS-MG |
| *vs.* | ) ) | |
| NICHOLAS DRAHER, LAWRENCE CRESS, and DAVID ELLIS, | ) ) ) | |
| *Defendants*. | ) ) | |

## ORDER

When Plaintiff Marian Borondy's son, Nick Diaz, began acting erratically in the early morning hours of June 7, 2019, she called 911 and requested assistance.  Indianapolis Metropolitan Police Department ("IMPD") Officers Nicholas Draher, Lawrence Cress, and David Ellis all responded to the call.  The officers determined that they could not detain Mr. Diaz pursuant to IMPD policy, but Mr. Diaz agreed to voluntarily go to the hospital by ambulance.  Before getting into the ambulance, however, Mr. Diaz fled and was found deceased several days later.  Ms. Borondy, individually and as the personal representative of Mr. Diaz's Estate, initiated this litigation against Officers Draher, Cress, and Ellis in August 2020 and alleges that Defendants violated Mr. Diaz's civil rights, in violation of 42 U.S.C. § 1983.  [Filing No. 1.]  Defendants have filed a Motion for Summary Judgment, which is now ripe for the Court's review.  [Filing No. 41.]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

1

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS[1]

**A.      IMPD's Procedures**

*1.      Detention Procedures*

IMPD General Order 4.7 provides, in relevant part, as follows:

**DEFINITIONS**

<u>Dangerous</u> – As used in this general order, 'dangerous' shall be defined as:

1.      An individual who presents an imminent risk of personal injury to themselves or to another individual; or

2.      An individual who may present a risk of personal injury to themselves or to another individual in the future and the person:

a.      Has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and the person has not demonstrated a pattern of voluntarily and consistently taking medication while not under supervision; or

b.      Has documented evidence that would give rise to a reasonable belief that the person has a propensity for violent or emotionally unstable conduct.

*            *            *

---

[1] The Court notes that Ms. Borondy did not comply with Local Rule 56-1(b), which requires the non-movant to include in their response to a Motion for Summary Judgment "a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. L.R. 56-1(b). Instead, Ms. Borondy presented her own version of the facts, without specifically identifying factual disputes, in a section titled "Additional Pertinent Facts Precluding Summary Judgment." [Filing No. 54 at 2.] Nevertheless, the Court has attempted to identify factual disputes and has set forth the facts drawing all inferences in Ms. Borondy's favor as the non-movant.

Immediate Detention – A hold for up to twenty-four (24) hours, that can be initiated by a law enforcement officer, having reasonable grounds to believe an individual is:

1.   Mentally ill;

2.   An imminent danger to themselves or others or gravely disabled; and

3.   In immediate need of hospitalization and treatment.

The individual will be apprehended and transported to the nearest appropriate medical facility.

Mental Illness – A psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. This includes intellectual disability, alcoholism, and addiction to narcotics or dangerous drugs.

**PROCEDURE**

**I.   Operational Responsibilities**

A.   An officer who has reasonable grounds to believe a person qualifies for an Immediate Detention, as defined above, may place that person under Immediate Detention.  Signs that can lead to reasonable grounds include, but are not limited to, the following:

1.   General Appearance (Manner of dress and type of clothing, personal hygiene, avoiding eye contact or staring, etc.);

2.   Speech (Is the rate slow, fast, or halting?  What is the volume?  Is it flat or excited?);

3.   Mood (What is the individual's response to the question, "How are you doing?"  What is their expression and attitude?);

4.   Any mention or threat of suicide (including gestures and/or attempts);

5.   Any threat or action to harm another individual;

6.   Observed violent or reckless behavior (including property destruction);

7.      Extreme agitation, anxiety, propensity for violence, or panic;

8.      Immobilized by some type of disorder (i.e. depression, improper medication, psychotic episodes, etc.) and unable to care for themselves;

9.      Extremely irrational, confused, illogical, or paranoid; and/or

10.      Alcohol/drug intoxication or withdrawal that could present an immediate health risk.

\*        \*        \*

**II.**    **Immediate Detention**

A.    Officers may have situations where an individual needs to be placed under Immediate Detention for his/her own safety or the safety of others.

B.    When taking an individual into custody for Immediate Detention, officers will adhere to the following guidelines:

1.      The individual shall be restrained in accordance with procedures outlined in General Order 8.1 – *Prisoner Handling, Transportation, & Escape*.

2.      An individual taken into custody under Immediate Detention status shall be handcuffed behind the back *unless exigent circumstances exist*.

C.    A search of an individual and their possessions shall be conducted for weapons and/or items that would constitute an obvious threat to the safety of the individual, officer, or the public.

D.    Officers must complete an Immediate Detention Form, IMPD Form No. 6-5-24 R4.

E.    Officers will also complete an incident report using the offense "Immediate Detention" and detail the circumstances under which the individual was taken into custody….

F.    Individuals placed under Immediate Detention shall be transported as soon as possible to the hospital or appropriate facility via wagon (if available), unless emergency medical treatment and continuous medical care is warranted.

[Filing No. 42-13 at 1-4 (emphasis in original).]

5

Immediate detentions are done sparingly because they, like an arrest, curtail an individual's freedom.  [Filing No. 42-2 at 71-72.]  If an officer immediately detains an individual without grounds for doing so, the officer could face civil or criminal liability or professional discipline. [Filing No. 42-2 at 74.]

       *2.*     *Missing Person Procedures*

IMPD General Order 4.6 provides, in relevant part, as follows:

**DEFINITIONS**

*          *          *

Missing Person – A missing person is defined as:

- Any person eighteen (18) years of age or older whose whereabouts cannot be determined, and the absence is a significant deviation from normal behavior and cannot be explained; or

- Any person who leaves on his or her own volition but does not have the authority to do so (also known as a "walk-away").  This includes, but is not limited to, a walk-away from an institution, such as a hospital, nursing home, residential group home, etc.

*          *          *

Extenuating Circumstances – Any circumstance that places a missing person or runaway at risk.  Some examples of extenuating circumstances may include, but are not limited to, the following:

*          *          *

- The person is thought to have an emotional instability;

*          *          *

- The person's absence is a significant deviation from normal behavior and cannot be explained;

- The well-being of the person is thought to be in jeopardy or otherwise at risk.

6

*    *    *

**PROCEDURE**

**I.**  **Officer Responsibilities for All Runaway and Missing Person Cases**

*    *    *

  B.  If there are any extenuating circumstances, as described above, a uniformed officer will be dispatched to the scene to conduct an investigation.  The scene may be the last known location of the missing person, or the current location of the person reporting the incident.

*    *    *

  F.  Officers must immediately report the missing person information to the appropriate unit in order for it to be entered into IDACS/NCIC **within two (2) hours of receipt** *(required by state law)*.

*    *    *

**II.**  **Additional Responsibilities if Extenuating Circumstances Exist**

  A.  The <u>responding officer</u> will request a Missing Persons detective be dispatched to the scene.

[Filing No. 52-1 at 1-4 (emphasis in original).]

**B.**  **Mr. Diaz's Health History**

In 2005, Mr. Diaz was diagnosed with bipolar disorder.  [Filing No. 42-1 at 29; Filing No. 42-1 at 33-34.]  He began having substance abuse and dependency issues in 2009 and received treatment for those issues, and for his mental health issues, for nearly fifteen years.  [Filing No. 42-1 at 31-32.]  In July 2018, Mr. Diaz was admitted to the hospital for a suicide attempt.  [Filing No. 42-1 at 37-38.]

**C.**  **The Events of June 6 and 7, 2019**

Mr. Diaz sometimes stayed at Ms. Borondy's house at 7149 East Hanna Avenue in Indianapolis, and did so on the evening of June 5, 2019.  [Filing No. 42-1 at 14-15; Filing No. 42-

7

1 at 39.]  On the morning of June 6, 2019, Ms. Borondy did not see Mr. Diaz before she left for

work, which was unusual.  [Filing No. 42-1 at 39.]  Around lunchtime that day, Ms. Borondy saw

Mr. Diaz on the road near 10th Street and Franklin Road in Indianapolis, picked him up, and took

the rest of the day off of work to be with him.  [Filing No. 42-1 at 40; Filing No. 42-1 at 43; Filing

No. 42-19 at 4-5.]  Ms. Borondy thought that something did not seem right with Mr. Diaz – he was

"kind of spiraling down a little mentally" and he did not tell her what he had been doing that

morning.  [Filing No. 42-1 at 43-44.; Filing No. 42-19 at 5.]

Later on June 6, 2019, as the evening approached, Ms. Borondy and Mr. Diaz went to a

Lowe's or Home Depot, but Mr. Diaz abruptly left the store without Ms. Borondy.  [Filing No. 42-

1 at 46-47; Filing No. 42-19 at 5.]  About an hour and a half later, Mr. Diaz called Ms. Borondy

from a gas station and she picked him up there around 9:40 p.m. and took him to her house.  [Filing

No. 42-1 at 46-48; Filing No. 42-19 at 5.]

During the early morning of June 7, 2019, Mr. Diaz's behavior worsened and Ms. Borondy

became concerned for her safety.  [Filing No. 42-1 at 49; Filing No. 42-19 at 5.]  Mr. Diaz walked

around Ms. Borondy's house with a lit candle holding large kitchen knives, and pulled appliances

out from the walls.  [Filing No. 42-19 at 5.]  He was acting paranoid and barricaded the front door

with a chair.  [Filing No. 42-1 at 56; Filing No. 42-19 at 5.]  Ms. Borondy believed that Mr. Diaz

was in "full-blown psychosis" and needed help.  [Filing No. 42-1 at 49; Filing No. 42-1 at 55-56;

Filing No. 42-19 at 7.]

### D.     Ms. Borondy Calls 911

At around 5:15 a.m. on June 7, 2019, Ms. Borondy called 911 and requested crisis-intervention-team ("CIT")[2] trained officers and medics.  [Filing No. 42-1 at 58; Filing No. 42-1 at 67; Filing No. 42-6 at 9-10.]  Ms. Borondy conveyed the following to police dispatch during the 911 call:

- Her 28-year old son was "mental emotional currently in psychosis," [Filing No. 43 at 00:08-00:12];

- Mr. Diaz was "carrying a kitchen knife in his pocket," [Filing No. 43 at 00:13-00:18];

- "The knife has been in his hand this whole time," [Filing No. 43 at 00:56-00:59];

- "He's still holding the knife," [Filing No. 43 at 00:58-01:00]; and

- "[H]e's holding the knife in a way to protect himself; he's not coming after anybody with it at this time," [Filing No. 43 at 01:00-01:08].

Officers Ellis, Cress, and Draher, who all have CIT training, responded to the 911 call.  [Filing No. 42-10 at 2-5; Filing No. 42-11 at 3; Filing No. 42-12 at 2-5.]

### E.     Officers Arrive on the Scene and Officer Ellis Decides Not to Immediately Detain Mr. Diaz

Officers Ellis, Cress, and Draher arrived at Ms. Borondy's house and Ms. Borondy opened the garage door to greet them.  [Filing No. 42-1 at 59.]  Mr. Diaz stood behind her, and had put the knives down on a table inside the house.  [Filing No. 42-1 at 60-61.]  Officer Ellis acted as the

---

[2] The CIT program "is a community partnership of law enforcement, mental health and addiction professionals, individuals who live with mental illness and/or addiction disorders, their families, and other advocates.  It is an innovative first-responder model of police-based crisis intervention training to help persons with mental disorders and/or addictions access medical treatment rather than place them in the criminal justice system due to illness-related behaviors.  It also promotes officer safety and the safety of the individual in crisis."  https://www.citinternational.org/What-is-CIT (last accessed January 7, 2022).

primary officer.  [Filing No. 42-10 at 2.]  No officers observed Mr. Diaz with a weapon.  [Filing No. 42-10 at 4; Filing No. 42-11 at 4-5; Filing No. 42-12 at 4.]

Everyone remained in the garage while Officer Ellis spoke with Ms. Borondy and Mr. Diaz.  [Filing No. 42-1 at 64-65; Filing No. 42-10 at 5-6.]  Officer Ellis, who did not know Mr. Diaz and was not aware of previous reports involving Mr. Diaz, listened to Ms. Borondy's concerns about Mr. Diaz's behavior, his mental health, and his efforts at sobriety.  [Filing No. 42-10 at 2; Filing No. 42-10 at 5-6.]  Ms. Borondy told Officer Ellis that Mr. Diaz had moved appliances around the house and had a knife, but was not aggressive toward anyone or threatening to harm himself.  [Filing No. 42-10 at 2.]  Ms. Borondy expressed to Officer Ellis that she believed Mr. Diaz had severe psychosis and needed to be seen by a physician.  [Filing No. 42-2 at 18; Filing No. 42-2 at 32.]  She also told Officer Ellis that Mr. Diaz suffered from bipolar disorder and had not been taking his medications.  [Filing No. 42-2 at 31.]  Officer Ellis knew that he had the discretion to immediately detain Mr. Diaz for mental health purposes only if certain conditions were met.  [Filing No. 42-2 at 64-65.]

Before speaking directly with Mr. Diaz, Officer Ellis told Ms. Borondy that based on her statements, it did not appear that the officers could pursue an immediate detention of Mr. Diaz because the conditions for doing so under Indiana law – that Mr. Diaz was a danger to himself, a danger to others, and in need of immediate medical assistance – were not present.  [Filing No. 42-10 at 5-6.]  Officer Ellis advised Ms. Borondy that he would speak directly with Mr. Diaz to see if officers could immediately detain him.  [Filing No. 42-10 at 5-6.]  Officer Ellis also told Ms. Borondy that if officers could not immediately detain Mr. Diaz under Indiana law, he would try to persuade Mr. Diaz to voluntarily go to the hospital.  [Filing No. 42-10 at 6.]

Mr. Diaz appeared very anxious, his eyes were darting around the room from person to person, he was avoiding eye contact, and he was mumbling answers to the officers' questions. [Filing No. 42-2 at 31; Filing No. 42-3 at 18; Filing No. 42-4 at 17-18.]   Officer Ellis did not observe Mr. Diaz being a danger to himself and when he asked Mr. Diaz if he wanted to hurt himself, Mr. Diaz said no.  [Filing No. 42-2 at 34.]  Officer Ellis did not, however, have any reason to dispute that Mr. Diaz was experiencing severe psychosis and the "argument could be made that he was emotionally unstable."  [Filing No. 42-2 at 32-33; Filing No. 42-2 at 54.]

Officer Ellis did not think Mr. Diaz was a danger to himself, and so concluded that he did not meet the criteria for immediate detention.  [Filing No. 42-2 at 35; Filing No. 42-2 at 71; Filing No. 42-10 at 5-6.]  Officer Ellis based his determination on his interaction with Mr. Diaz.  [Filing No. 42-2 at 33-34.]  However, although Mr. Diaz had told officers that he did not want to hurt himself and was not suicidal, Officer Ellis did not necessarily believe him.  [Filing No. 42-2 at 35.] Officer Ellis agreed that an individual who is experiencing a psychiatric episode, and who does things such as pulling appliances away from the wall, burning clothing, carrying knives, and appearing anxious is a person who presents a potential danger to themselves.  [Filing No. 42-2 at 33-34; Filing No. 42-4 at 20-21.]

Officer Cress had been told by police dispatch that Mr. Diaz was suffering from a mental illness, and he did not have any reason to dispute that or that Mr. Diaz was experiencing a behavioral psychiatric episode.  [Filing No. 42-3 at 18-20.]  Officer Cress heard Mr. Diaz say that he was not suicidal, did not want to hurt himself, and did not want to go to the hospital.  [Filing No. 42-3 at 9; Filing No. 42-11 at 2.]  Officer Cress agreed that Mr. Diaz could not be immediately detained.  [Filing No. 42-3 at 8; Filing No. 42-11 at 2; Filing No. 42-11 at 6.]  Officer Draher heard

Officer Ellis ask Mr. Diaz if he wanted to go to the hospital, and Officer Draher knew that Mr. Diaz did not meet the immediate detention criteria.  [Filing No. 42-4 at 10; Filing No. 42-12 at 2.]

### F.    Officer Ellis Convinces Mr. Diaz To Go To the Hospital Voluntarily

Even though Officer Ellis could not force Mr. Diaz to go to the hospital since he did not meet the criteria for immediate detention, Officer Ellis still thought that Mr. Diaz could benefit from seeing a doctor.  [Filing No. 42-2 at 29.]  Based on his observations, what Ms. Borondy told him, and from speaking to Mr. Diaz, Officer Ellis believed that Mr. Diaz should go to the hospital "for any medical treatment that medical professionals thought would be beneficial or necessary." [Filing No. 42-2 at 29.]  Ms. Borondy wanted Mr. Diaz to go to the hospital also, and Officer Ellis tried to get Mr. Diaz to go to the hospital voluntarily.  [Filing No. 42-10 at 2; Filing No. 42-10 at 6.]

Officer Ellis told Mr. Diaz, as a bluff, that he would immediately detain Mr. Diaz if he did not voluntarily go to the hospital.  [Filing No. 42-10 at 5-6.]  Officer Ellis bluffed because he believed that sometimes individuals who do not meet the criteria for immediate detention but would benefit from seeing a doctor are more willing to go to the hospital for treatment if they believe they have a choice or say in the matter.  [Filing No. 42-12 at 6-7.]  Officer Ellis did not give Mr. Diaz the option to leave, nor did he ever tell him that he was free to do so, but Mr. Diaz could have refused to go to the hospital, gone back inside the house, or left the property.  [Filing No. 42-2 at 47; Filing No. 42-2 at 73.]  Mr. Diaz also was not handcuffed at any point during the encounter.  [Filing No. 42-1 at 64; Filing No. 42-2 at 66.]  After speaking with Officer Ellis, Mr. Diaz agreed to voluntarily go to the hospital by ambulance.  [Filing No. 42-1 at 72-73; Filing No. 42-5 at 2; Filing No. 42-7 at 6; Filing No. 42-10 at 6; Filing No. 42-11 at 2.]

### G.   Mr. Diaz Flees

Mr. Diaz began walking toward the ambulance with an officer and a medic, and Ms. Borondy also began walking toward the ambulance but an officer pulled her aside to speak with her.  [Filing No. 42-1 at 73-75.]  When Mr. Diaz reached the ambulance, he fled.  [Filing No. 42-2 at 36; Filing No. 42-11 at 2.]  He ran past Ms. Borondy, who tried to grab him but an officer stopped her and told her to let him go.  [Filing No. 42-1 at 75.]  Mr. Diaz was so close to Ms. Borondy that she "could have done something."  [Filing No. 42-1 at 77.]  Mr. Diaz then ran south through a wooded area.  [Filing No. 42-1 at 81.]  Ms. Borondy asked the officer she was speaking with if he planned to chase Mr. Diaz, and he said no.  [Filing No. 42-1 at 75-76.]  Officer Ellis told Ms. Borondy that Mr. Diaz was not in police custody, and Officer Cress overheard Officer Ellis and agreed, yelling out "no, he's not."  [Filing No. 42-11 at 2.]

### H.   Officers Do Not Extensively Search for Mr. Diaz

Officer Draher followed Mr. Diaz to the end of the property near the woods, but returned to the ambulance when he did not see Mr. Diaz.  [Filing No. 42-4 at 21-22; Filing No. 42-12 at 2.]  In all, Officer Draher pursued Mr. Diaz for only a few seconds and for approximately ten feet.  [Filing No. 42-3 at 22.]  Officer Draher did not search the woods or use any force to seize Mr. Diaz because Mr. Diaz had not committed a criminal act and was not in custody, under arrest, or immediately detained.  [Filing No. 42-1 at 80; Filing No. 42-2 at 73; Filing No. 42-12 at 2.]  Officer Ellis discouraged Officer Draher from following Mr. Diaz into the woods because Mr. Diaz was not in custody.  [Filing No. 42-2 at 36-37; Filing No. 42-3 at 22; Filing No. 42-11 at 2.]  Additionally, the officers did not search for Mr. Diaz because it was dark outside, there was uneven terrain, and it was an unnecessary risk since Mr. Diaz was not in custody, under arrest, or detained.  [Filing No. 42-2 at 37-39.]

Mr. Diaz was not located, and Officer Draher left the scene because he was called to another run. [Filing No. 42-4 at 24; Filing No. 42-12 at 2.] Officer Draher had no further involvement with Mr. Diaz and neither he, Officer Ellis, or Officer Cress created any report related to the incident. [Filing No. 42-2 at 56; Filing No. 42-3 at 29; Filing No. 42-4 at 27; Filing No. 42-4 at 33-34; Filing No. 42-11 at 7-8.] Officer Ellis drove around the area briefly in an attempt to locate Mr. Diaz, but then left. [Filing No. 42-2 at 44-45.] Additionally, there was no missing persons report created, and none of the officers conducted any investigation after Mr. Diaz fled. [Filing No. 42-2 at 54-56; Filing No. 42-3 at 26-27; Filing No. 42-4 at 33-34.]

The medics who were on the scene completed a run report which stated:

> [Upon arrival], patient found standing in the garage with IMPD officers and his mother at his side. Family reported that the patient had been carrying knives around the house, been burning holes in his clothes and pulled the oven away from the wall knocking over and breaking the microwave. They believed that he had a history of bipolar disorder but was not taking any medications for it. He had been to Valle Vista before for substance abuse and had been on suboxone as part of his treatment. He appeared very anxious. His eyes kept darting around the room and from person to person. IMPD officer was asking the patient questions. He would avoid his gaze and would mumble answers. He acknowledged his behavior was not normal but didn't feel like he needed to go to a hospital and thought that his mother was over-exaggerating the events of the morning. IMPD officer speaking to the patient gave him 2 options; go willingly with EMS or be forcefully detained and go with EMS. The patient eventually agreed to allow EMS to transport him to Eskenazi Hospital for an evaluation. He walked with IMPD officers at his side towards the ambulance. Once he reached the ambulance, he side-stepped one of the officers and took off in a sprint toward the woods. IMPD attempted to find the patient for about 5 minutes before giving up. They informed the crew they would call back if they found him.

[Filing No. 42-5 at 2.]

## I.     Detectives Find Mr. Diaz's Body

On June 10, 2019, Ms. Borondy completed a missing person's report for Mr. Diaz at the IMPD Southeast District office. [Filing No. 42-7 at 4-8.] The report noted that "[Ms. Borondy]

stated that the police were called and [Mr. Diaz] agreed to voluntarily going (sic) to the hospital." [Filing No. 42-7 at 6.]

On June 14, 2019, IMPD missing-persons detectives located Mr. Diaz's body at the bottom of an electrical tower near Ms. Borondy's house.  [Filing No. 42-8 at 2.]  An autopsy revealed that Mr. Diaz sustained multiple cervical fractures, among other injuries.  [Filing No. 42-1 at 83; Filing No. 42-9 at 2.]  Mr. Diaz was wearing the same clothes he was wearing on June 7, 2019, and his body was in an advanced stage of decomposition.  [Filing No. 42-1 at 83-84; Filing No. 42-9 at 3.] The Marion County Coroner's Office concluded that Mr. Diaz's cause of death was "[c]ombined toxic effects of multiple drugs including Amphetamine, Methamphetamine, and Buprenorphine," and a toxicology report revealed that Mr. Diaz had alcohol, amphetamine, methamphetamine, and THC in his system.  [Filing No. 42-9 at 1; Filing No. 42-9 at 6-11.]

### J.   The Lawsuit

Ms. Borondy, individually and as Personal Representative of Mr. Diaz's Estate, and Moraima Velez-Sharkey, the parent and legal guardian of Mr. Diaz's two minor children, initiated this litigation on August 14, 2020 against the City of Indianapolis (the "City"), Officers Draher, Cress, and Ellis, and three additional IMPD officers.  [Filing No. 1.]  On December 3, 2020, the Court accepted a stipulation by the parties that Ms. Velez-Sharkey should be dismissed as a Plaintiff, and that Ms. Borondy's claims against the three additional officers and her intentional infliction of emotional distress claim against Officers Draher, Cress, and Ellis should be dismissed. [Filing No. 25 at 1.]  On January 29, 2021, the Court granted a Motion for Partial Judgment on the Pleadings filed by the City.  [Filing No. 31.]

That left pending Ms. Borondy's constitutional claims against Officers Draher, Cress, and Ellis, which include: (1) a Fourth Amendment claim for failing to provide adequate medical care

to Mr. Diaz while he was in Defendants' custody; (2) a Fourteenth Amendment claim for failing to protect Mr. Diaz from harm by failing to properly restrain him, allowing him to escape custody, and failing to conduct an adequate and/or meaningful search for him or otherwise effectuate his safe return; and (3) a Fourteenth Amendment claim for failing to provide adequate medical attention while in Defendants' custody.  [Filing No. 37 at 6-11.]  Defendants now seek summary judgment on those remaining claims.  [Filing No. 41.]

### III.
#### DISCUSSION

The Court notes at the outset that it is clear from Ms. Borondy's Statement of Claims and from her response to Defendants' Motion for Summary Judgment that her remaining claims are asserted only on behalf of Mr. Diaz's Estate and not individually.  [*See* Filing No. 37 (Statement of Claims referring only to Mr. Diaz's constitutional rights); Filing No. 54 (response to Motion for Summary Judgment referring only to "the Estate's" claims).]  The Court considers the pending Motion for Summary Judgment accordingly.

In their Motion for Summary Judgment, Defendants argue that: (1) the Estate's Fourth Amendment claim fails because Mr. Diaz was never in custody or seized; (2) even if Mr. Diaz was in custody or seized, Defendants' response to his medical needs was objectively reasonable; (3) Defendants did not commit a constitutional violation under the Fourteenth Amendment's substantive due process clause; (4) the Estate does not have viable Fourteenth Amendment failure-to-protect or medical care claims; (5) Defendants cannot be liable for failing to restrain, pursue, search for, rescue, or prepare a report for Mr. Diaz, nor can they be liable for violating IMPD policies or procedures; and (6) Defendants are entitled to qualified immunity.  [Filing No. 45 at 12-35.]  The Court discusses the last argument first, as it is ultimately dispositive.

In support of their Motion for Summary Judgment, Defendants argue that even if the Court finds that Defendants violated Mr. Diaz's constitutional rights, "[n]o caselaw put the officers on notice that their June 7, 2019 conduct violated [Mr. Diaz's] clearly established Fourth or Fourteenth Amendment rights." [Filing No. 45 at 34.] They assert that the claims "consist of various elements and balancing tests," and there is no existing caselaw addressing the same circumstances presented here. [Filing No. 45 at 34-35.] Defendants also contend that this is not "the rare, obvious case where the unlawfulness of the officers' conduct is sufficiently clear even though existing precedent does not address similar circumstances." [Filing No. 45 at 35 (quotation and citation omitted).]

In her response, Ms. Borondy argues that she has demonstrated several constitutional violations. [Filing No. 54 at 31.] She also argues that Mr. Diaz's constitutional rights were clearly established because "[a]s early as 1979, the Seventh Circuit held that police officers violated due process by placing civilians in dangerous situations," and that "[i]t is also clearly established that providing no medical care in the face of a serious health risk constitutes deliberate indifference." [Filing No. 54 at 31.] Ms. Borondy contends that there are disputed issues of material fact that preclude resolution of the qualified immunity issue, and that "reasonable police officers should have realized that permitting [Mr. Diaz] to flee their custody, holding back his mother from stopping him, and then failing to conduct any adequate search to secure his return to safety and much needed medical treatment, could jeopardize his safety by placing him in a dangerous situation." [Filing No. 54 at 32.]

In their reply, Defendants argue that it is Ms. Borondy's burden to defeat qualified immunity. [Filing No. 55 at 12.] They assert that Ms. Borondy must point to caselaw clearly establishing that Defendants' specific conduct violated Mr. Diaz's constitutional rights, and not just to caselaw suggesting a general rule. [Filing No. 55 at 13.] Defendants argue that the cases Ms.

17

Borondy cites relating to her Fourteenth Amendment claim dealt with inapposite circumstances, including officers leaving minor children in a car in inclement weather and prison doctors being deliberately indifferent to a prisoner's medical condition.  [Filing No. 55 at 14-15.]  Defendants also note that Ms. Borondy did not cite any caselaw in response to Defendants' assertion that they are entitled to qualified immunity on Ms. Borondy's Fourth Amendment claim, and so has waived any such opposition.  [Filing No. 55 at 15-16.][3]

Qualified immunity "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).  It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  In order to determine whether a defendant is entitled to qualified immunity, courts ask "whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *McAllister*, 615 F.3d at 881.

The Court assumes without deciding that Defendants violated Mr. Diaz's Fourth and Fourteenth Amendment rights, and moves directly to the second issue in its analysis – whether the rights that were violated were clearly established.  *See Smith v. Finkley*, 10 F.4th 725, 737 (7th

---

[3] Ms. Borondy filed a surreply in which she addresses Defendants' argument in their reply that Ms. Borondy relied upon inadmissible expert testimony in opposition to the Motion for Summary Judgment.  [Filing No. 60.]  Specifically, the surreply addresses the admissibility of expert testimony from Roger Chappell, a former police officer and hostage negotiator, who opines that Mr. Diaz was in Defendants' custody on June 7, 2019, that he should have been and was immediately detained, and that Defendants violated generally accepted policing standards and procedures as well as IMPD's General Orders.  [Filing No. 52-2; Filing No. 60.]  Because the issues on which Mr. Chappell opines are not relevant to the qualified immunity analysis, the Court will not and does not rule on the admissibility of Mr. Chappell's testimony or otherwise discuss that opinion.

Cir. 2021) (courts may address whether constitutional right was violated and whether the right was clearly established "in either order").  A right is clearly established for purposes of qualified immunity where: (1) "a closely analogous case establishes that the conduct is unconstitutional"; or (2) "the violation is so obvious that a reasonable state actor would know that [his actions] violate[] the Constitution." *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001); *see also Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (constitutional right is clearly established for purposes of qualified immunity analysis if "every reasonable official would interpret [then-existing precedent] to establish the particular rule the plaintiff seeks to apply").  Moreover, the rule must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.*  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 987 (7th Cir. 2021), and the focus "is on whether the officer had fair notice that [his] conduct was unlawful," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Although qualified immunity is an affirmative defense,…the plaintiff bears the burden of showing that the constitutional right allegedly violated was clearly established at the time of the challenged conduct." *Purvis v. Oest*, 614 F.3d 713, 715 (7th Cir. 2010).

### A.      Fourth Amendment

The Fourth Amendment provides that the "right of the people to be secure in their persons,…against unreasonable searches and seizures, shall not be violated." U.S. CONST. AMEND. IV.  In order to show that Mr. Diaz's constitutional right to be immediately detained and provided medical care under the Fourth Amendment was clearly established, Ms. Borondy is not required to point to "a case presenting the exact same facts." *Taylor v. City of Milford*, 10 F.4th 800, 807

(7th Cir. 2021).  She is, however, required to point to "existing precedent [that places] the statutory or constitutional question beyond debate."  *Lopez*, 993 F.3d at 987.

Ms. Borondy has not pointed to any caselaw showing that Mr. Diaz's rights under the Fourth Amendment to be immediately detained, prevented from fleeing, and transported to the hospital under the circumstances present on June 7, 2019 are clearly established, nor has the Court located any.  Indeed, she has not cited any cases involving the Fourth Amendment at all.  Perhaps this is because plaintiffs generally invoke the Fourth Amendment in support of a claim that a defendant police officer had no grounds to seize the plaintiff or used excessive force during an arrest or seizure.  But Ms. Borondy claims that Defendants violated the Fourth Amendment by not taking enough action against Mr. Diaz so that he would not be able to flee and could be transported to the hospital.  In other words, Ms. Borondy's claim is that Defendants had seized Mr. Diaz, but they should have seized him more.  There simply is no caselaw to support the notion that such a right is clearly established under the circumstances present on June 7, 2019, and Defendants are entitled to qualified immunity on the Fourth Amendment claim.

### B.   Fourteenth Amendment

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Ms. Borondy alleges that Defendants violated the Fourteenth Amendment by failing to properly restrain Mr. Diaz, allowing him to flee, and failing to conduct an adequate or meaningful search for him.  But again, Ms. Borondy has not pointed to any legal precedent establishing such a right under the circumstances present on June 7, 2019.  The two cases she relies upon arose under circumstances that are significantly distinguishable from the circumstances presented here.

First, the case Ms. Borondy cites for the proposition that "[a]s early as 1979, the Seventh Circuit held that police officers violated due process by placing civilians in dangerous situations," [Filing No. 54 at 31], involved officers leaving minor children in a car on the highway during inclement weather after arresting the adult driver. *See White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). This is not analogous to the situation presented on June 7, 2019, when Defendants determined they had no legal basis to immediately detain Mr. Diaz and he fled. Second, the case Ms. Borondy relies upon for the statement that "[i]t is also clearly established that providing no medical care in the face of a serious health risk constitutes deliberate indifference," [Filing No. 54 at 31], involved an Eighth Amendment claim by a prisoner against prison doctors and nurses for failure to treat a wound on the prisoner's hand and finger. *See Walker v. Benjamin*, 293 F.3d 1030 (7th Cir. 2002). A medical professional's failure to treat a patient in custody is not sufficiently similar to an officer's failure to transport an individual to a hospital after questioning the individual and concluding that he is not a danger to himself or others. Put simply, neither *White* nor *Walker* comes close to establishing the Fourteenth Amendment rights Ms. Borondy asserts on behalf of Mr. Diaz under the circumstances present on June 7, 2019, much less places those rights "beyond debate." *Lopez*, 993 F.3d at 987; *see also City of Escondido, Cal. v. Emmons,* 139 S. Ct. 500, 503 (2019) ("[A] clearly established right must be defined with specificity. [The Supreme Court] has repeatedly told courts…not to define clearly established law at a high level of generality.") (quotation and citation omitted). Ms. Borondy has attempted to define the rights at issue at far too high a level of generality, and Defendants are entitled to qualified immunity on Ms. Borondy's Fourteenth Amendment claim as well.

Mr. Diaz's rights under the Fourth and Fourteenth Amendments to be immediately detained, prohibited from fleeing, and searched for after he fled are not clearly established under

the law.  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment.  [Filing No. 41.]

## IV.
### CONCLUSION

The Court recognizes the tragic circumstances of this case and sympathizes with Ms. Borondy's desire to hold someone accountable for her son's death.  However, the claims she brings assert constitutional violations for which qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *Malley*, 475 U.S. at 341, and it protects Officers Draher, Cress, and Ellis here.  For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, [41].  Final judgment shall enter accordingly.

Date: 1/10/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**